493 F.2d 590
 Irving I. BASS, trustee in Bankruptcy for J. B. Hanauer &
Co., a California corporation, Appellant,
v.
AMERICAN INSURANCE COMPANY, a New Jersey corporation, Appellee.
AMERICAN INSURANCE COMPANY, a New Jersey corporation,
Cross-Complainant-Appellee,
v.
Fred LANDAU et al., Cross-Defendants-Appellees.
 No. 71-2838.
 United States Court of Appeals, Ninth Circuit.
 March 12, 1974.
 
 Timothy M. Thornton, Robert Hinerfeld (argued), of Simon, Sheridan, Murphy, Thornton & Medvene, Los Angeles, Cal., Quittner, Stutman, Treister & Glatt, Los Angeles, Cal., for appellant.
 William J. Conners, of Anderson, McPharlin & Conners, Los Angeles, Cal., E. L. Graser (argued), of Wadsworth, Fraser, McClung & Dahl, Los Angeles, Cal., for appellee.
 Before ELY and SNEED, Circuit Judges, and SOLOMON,[1] District judge.
 SOLOMON, Judge:
 
 
 1
 Appellant, as trustee in bankruptcy for J. B. Hanauer & Co. (the company), filed an action against American Insurance Company (American) to recover on a fidelity bond issued to protect the company against dishonest, fraudulent or criminal acts of its employees.
 
 
 2
 American filed a third party action against the officers of the company for indemnity if American were found liable under the bond.
 
 
 3
 The Court granted American's motion for summary judgment against the trustee, and it also granted the third party defendants' motion for summary against American.
 
 
 4
 The trustee appealed from the summary judgment granted American against him.
 
 
 5
 J. B. Hanauer & Co. was a closely held corporation engaged in the purchase and sale of municipal bonds. The company warehoused municipal bonds with various parties, and when it sold one or more bonds, it repurchased the bonds from the warehousemen for delivery to its customers. Under the warehousing agreement, the company on demand of the warehousemen was obligated to repurchase the bonds at the contract price without regard to the market price or whether the company had a buyer for them.
 
 
 6
 In 1965, the company operated at a profit. But in 1966, the municipal bond market fell and the company sustained a net operating loss of $145,000. While the bond market was falling, Fred Landau, the largest bond warehouser and the company's principal shareholder, demanded that the company repurchase the bonds that he was warehousing. The company complied, but this repurchase left the company without operating funds. Thereafter, when customers purchased bonds, the company deposited the payments it received for the bonds in its general operating account. The company used this money to pay salaries and operating costs instead of repurchasing the bonds for delivery to its customers.
 
 
 7
 The fidelity bond which American issued protected the company against:
 
 
 8
 '(a) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees.'
 
 The bond did not cover:
 
 9
 (g) Any loss resulting directly or indirectly from trading with or without the knowledge of the insured, in the name of the insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance . . ..'
 
 
 10
 The trustee in one count charged that vice-president Warburton falsely represented to a customer that the bonds he sold the customer belonged to the company when the bonds belonged to him. At the time of the sale Warburton gave the customer a warehousing repurchase agreement binding the company. When the market value of the bonds fell, the customer demanded that the company repurchase the bonds. The trustee charged that the company lost $9,000 when it repurchased these bonds to protect its image.
 
 
 11
 In a second count, the trustee charged that vice-president Warburton misrepresented the market value of bonds when he sold them to a customer. The customer sued the company, charging that he relied on Warburton's statement and purchased the bonds for $57,000 although the bonds had a par value of $50,000 and a fair market value of $47,000.
 
 
 12
 The trustee in a third count charged that Jack B. Hanauer, the company's president, and George Dann, a vice-president, fraudulently accepted customers' money for bonds when they knew the company could not deliver. The trustee charged that the company suffered a loss because this money was used to pay corporate expenses.
 
 
 13
 In the fourth count, the trustee charged that president Hanauer and the principal shareholder, Fred Landau, caused the company to improperly purchase delinquent bond coupons on Sleepy Hollow Acres, property in which they held personal interests, and that as a result of the purchase the company lost $19,564.
 
 
 14
 American filed a third party complaint against Hanauer, the company president, and Dann, a company vice-president, in which American sought judgment against them individually if American was held liable on the third and fourth counts. Both American and the third party defendants filed motions for summary judgment. Hanauer and Dann filed affidavits and transcripts of the proceedings in cases filed by the trustee against officers of the corporation and others in the State courts of New York and California. American incorporated these affidavits and transcripts in its motion for summary judgment against the trustee. The trustee did not file a counter-affidavit on these issues.
 
 
 15
 The first two counts relate to the sale of bonds by Warburton, a company vice-president.
 
 
 16
 It was uncontroverted that the company regarded filling sales orders, servicing customers, and underwriting municipal bonds as activities within the meaning of the term 'trading'.
 
 
 17
 Even without this company interpretation and practice, these sales came within the definition of the term 'trading'. Sutro Bros. & Co. v. Indemnity Insurance Company of North America, 264 F.Supp. 273 (S.D.N.Y. 1967), aff'd 386 F.2d 798 (2d Cir. 1967); Roth v. Maryland Casualty, 209 F.2d 371 (3rd Cir. 1954). The trial court properly granted summary judgment on these two counts.
 
 
 18
 In count three, the trustee charged that Hanauer and Dann solicited and accepted orders for bonds when they knew that the monies received for these bonds would be used for the operation of the company and for other company expenses. The trustee asserted that he is entitled to be indemnified and held harmless for the losses sustained by customers as the result of such conduct.
 
 
 19
 The trustee did not contend that the officers of the company diverted customers' funds for their own use.
 
 
 20
 On this theory of recovery the court granted summary judgment against the trustee because American's fidelity bond indemnified the company 'against its losses only and not against liability it might have to third parties'.
 
 
 21
 The court found that the customers' funds for the purchase of securities were deposited in the company's general corporate account and were used to pay the regular and normal operating expenses of the company and that the use of the funds for such purposes was not covered by the bond. Fidelity & Deposit Co. of Maryland v. Usaform Hail Pool, Inc., 463 F.2d 4 (5th Cir. 1972); Levey v. Jamison, 82 F.2d 958 (4th Cir. 1936).
 
 
 22
 It is not necessary for this Court to consider whether the two State court actions, one brought in New York and the other in California, are res judicata or whether the doctrine of collateral estoppel would apply because the other grounds on which the court granted summary judgment on count three are adequate.
 
 
 23
 We have considered but will not discuss one new theory of recovery urged by the trustee in his reply brief, nor will we discuss the other new theory which he suggested for the first time in oral argument. Even if timely made, neither theory has any merit.
 
 
 24
 In count four, the trustee charged that the company purchased delinquent bond coupons on Sleepy Hollow Acres, a large tract which Hanauer and Landau were buying. The trustee contended that Hanauer and Landau caused the company to make this purchase to protect their personal investments in the property. The trustee seeks indemnification under the bond for the $19,564 the company lost because of its purchase of the delinquent interest coupons.
 
 
 25
 In 1961, the company was the underwriter of a $195,000 bond issue on existing streets and sewer lines in a portion of Sleepy Hollow Acres. The company made a profit of $25,000 on the sale of these bonds.
 
 
 26
 The lots in Sleepy Hollow Acres did not sell well. As a result Hanauer and Landau received no income from the property and failed to pay the bondholders interest as it became due. On February 26, 1965, the company's board of directors authorized the purchase of $19,564 in delinquent bond coupons. The company made the purchase to protect its own image. At the time the company purchased the coupons, Hanauer and Landau each agreed to invest an additional $35,000 of his personal funds toward the purchase price of the property. In July, 1965, Hanauer and Landau also invested $200,000 in the company's equity capital through the purchase of subordinated debentures.
 
 
 27
 On October 4, 1965, all of the shareholders at the annual meeting adopted a resolution approving the acts of the board of directors for the fiscal year ending July 31, 1965.
 
 
 28
 The trustee asserts the shareholders' resolution was invalid because under sections 800, 814, and 820 of the California Corporation Code when one or more directors have a financial interest in a contract or transaction with the corporation, a unanimous vote of all the directors is required for the corporation to authorize, approve or ratify the contract or transaction. Here, Hanauer's wife and daughter, two dummy directors neither of whom owned any stock or attended any directors meetings, were not present at this meeting and were not aware of the coupon purchase.
 
 
 29
 The District Judge granted summary judgment. He concluded the loss suffered in the coupon purchase was a 'trading loss' and is therefore excluded from coverage under the bond. He found that the company was not made insolvent by the coupon purchase, and the creditors which the trustee represents were not creditors of the company when it bought the coupons. He also concluded that if there was any irregularity in the transaction, it was cured when Hanauer and Landau contributed $200,000 to the equity capital of the company by the purchase of debenture bonds.
 
 
 30
 Moreover, this Court finds the trustee's interpretation of sections 800, 814 and 820 of the California Corporations Code is unduly restrictive. Here, all the active members of the board of directors, with knowledge of all the facts, approved the coupon purchase and all the shareholders unanimously adopted the resolution affirming the actions of the board of directors. The summary judgment on this count was proper.
 
 
 31
 Affirmed.
 
 
 
 [1]
 The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation